FILED
CLERK, U.S. DISTRICT COURT

11/4/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____EC_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>MOHAMMAD-SAEID BOUBASH,<br>  aka "Mamba,"<br>FNU LNU,<br>  aka "Raven,"<br>  aka "Greywind,"<br>  aka "Neom,"<br>FNU LNU,<br>  aka "ZZ9,"<br>  aka "ZNX,"<br>  aka "TG,"<br>  aka "Benjamin Kenneth<br>  Richardson,"<br>REYES RAMON LOZANO, and<br>GIL ESTEBAN VALDES GARATE,<br>  aka "Amigazo,"<br><br>            Defendants. | CR  2:22-cr-00513-JWH<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Distribution and Possession with Intent to Distribute of Methamphetamine; 21 U.S.C. § 846: Conspiracy to Distribute and to Possess with Intent to Distribute Methamphetamine; 18 U.S.C. § 924(c)(1)(A)(i): Possession of a Firearm in Furtherance of a Drug Trafficking Crime; 18 U.S.C. § 2(a): Aiding and Abetting; 21 U.S.C. § 853, 18 U.S.C. § 924(d)(1), 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.    Sophisticated end-to-end encrypted communications devices ("encrypted devices") from an encrypted communications company

(hereinafter, the "Encrypted Communications Company" or the "Company") based in Canada are sought out and used by drug trafficking organizations to facilitate the distribution of hundreds of kilograms of drugs through the United States and internationally. The Encrypted Communications Company was one of several providers of encrypted communication devices used by transnational drug trafficking organizations.

2.    The Encrypted Communications Company's encrypted devices had a standard Android operating system, that was modified to install the Encrypted Communications Company's own encrypted messaging software.  The Company's software on the encrypted devices allowed users to operate under heightened anonymity, allowed users to conceal and destroy evidence and compartmentalize the drug operation, and hindered and sometimes prevented law enforcement from intercepting or monitoring the communications.

3.    The Company sold encrypted devices with the Company's software through individuals located in several countries, including the United States, Canada, and Mexico, who either had a connection to the Company's administrators or were sub-distributors and received the devices from other distributors for resale.  Prospective purchasers had to be introduced to a distributor or sub-distributor by an existing user and the existing user had to vouch for the prospective user before a device could be purchased.  This restriction helped facilitate use of the Company's encrypted devices by criminal organizations, whose members could "vouch" for one another, and hindered law enforcement's ability to access and use such devices in order to investigate criminal activity.

4.    When purchasing an encrypted device, purchasers were not required to provide their name, address, or telephone number to the distributor.  Distributors and sub-distributors accepted payment by cash or cryptocurrency.  Once purchased, users were assigned a randomized unique identification number (akin to a telephone number) and a randomized email address hosted by the Company.  The user was then able to create their own "handle," the name that they used within the Company's secure messaging system, and could change their handle at any time.

5.    The encrypted devices were purchased with either a three-month, six-month, or one-year contract.  The price of the plans varied depending on the location, but were around $1,150 to $1,400 for a device plus three months of service.

6.    The Encrypted Communications Company's encrypted devices had the following key features that facilitated the international distribution of hundreds of kilograms of controlled substances:

a.    The Company's encrypted devices were closed-network devices, meaning that the Company's encrypted devices could only communicate with other encrypted devices of the Company.

b.    When Company's software was in use on a device, nearly all of the other standard features on the device were disabled, including GPS location information, cellular telephone features, all other applications, including text messaging applications, and the internet.  In practice, the only useable feature on an encrypted device while the Company's software was in use was the Company's encrypted messaging system.

c.    The Company's encrypted messaging software included a self-destruct feature that required users to choose how often

3

encrypted messages were automatically deleted on both the user's and recipient's encrypted devices, ranging from one hour to multiple days.  Users were prevented from disabling this feature.  There was also a "lightning wipe" feature which allowed users to set a particular message to be wiped immediately after it was read by the recipient.  Users could also retroactively modify the words of messages previously sent and also manually delete specific messages previously sent.

d.   The Company's encrypted messaging software included a lock feature, which prevented a user from forwarding messages to other users.

e.   The Company's encrypted messaging software also had an automatic wipe feature that allowed users to automatically wipe their encrypted devices by entering an incorrect password several times. Messages stored on the Company's encrypted devices could also be remotely deleted by the Company if the devices were seized by law enforcement or otherwise compromised.  In order to effectuate a remote wipe, users would contact the "tech support" for the Company, who were people who had access to the Company's software portal, and request a remote wipe.

f.   The Company's encrypted messaging system also had a "ghost chat" or "zero-knowledge group" feature, whereby a user could initiate a group message with other users and prevent the other users from learning the encrypted identities of one another.  When the "ghost chat" feature was used, the Company would assign randomized handles to all of the users within the chat and would prevent the users from accessing the Company's unique identification numbers of the other users in the chat.

4

7.   These Introductory Allegations are incorporated into each count of the Indictment.

1                                COUNT ONE

2                          [21 U.S.C. § 846]

3              [DEFENDANTS BOUBASH, RAVEN, ZZ9, AND LOZANO]

4      1.   The Grand Jury re-alleges and incorporates paragraphs 1

5 through 7 of the Introductory Allegations of this Indictment.

6 A.   OBJECTS OF THE CONSPIRACY

7      2.   Beginning on a date unknown and continuing until on or

8 about February 25, 2022, in Los Angeles and San Bernardino Counties,

9 within the Central District of California, and elsewhere, defendants

10 MOHAMMAD-SAEID BOUBASH, also known as ("aka") "Mamba" ("BOUBASH");

11 First Name Unknown Last Name Unknown, aka "Raven," aka "Greywind,"

12 aka "Neom" ("RAVEN"); First Name Unknown Last Name Unknown, aka

13 "ZZ9," aka "ZNX," aka "TG," aka "Benjamin Kenneth Richardson"

14 ("ZZ9"); and REYES RAMON LOZANO ("LOZANO"), conspired with others

15 known and unknown to the Grand Jury to knowingly and intentionally

16 distribute and to possess with intent to distribute the following

17 controlled substances:

18         a.   at least 50 grams of methamphetamine, a Schedule II

19 controlled substance, in violation of Title 21, United States Code,

20 Section 841(a)(1), (b)(1)(A)(viii); and

21         b.   at least five kilograms of a mixture and substance

22 containing a detectable amount of cocaine, a Schedule II narcotic

23 drug controlled substance, in violation of Title 21, United States

24 Code, Section 841(a)(1), (b)(1)(A)(ii)(II).

25 B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

26      ACCOMPLISHED

27      3.   The objects of the conspiracy were to be accomplished, in

28 substance, as follows:

a.    Defendants BOUBASH and RAVEN and other coconspirators would use the Encrypted Communications Company's encrypted devices to communicate regarding drug trafficking activities so that their communications could not be intercepted or decrypted by law enforcement.

b.    Defendant ZZ9 facilitated the distribution of controlled substances to defendant BOUBASH for further redistribution.

c.    Defendants BOUBASH, RAVEN, and ZZ9, and other coconspirators would use the encrypted devices to arrange purchases of controlled substances for further distribution.

d.    Defendant LOZANO would transport the controlled substances and distribute them to others.

C.    OVERT ACTS

4.    In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, defendants BOUBASH, RAVEN, ZZ9, and LOZANO, and others known and unknown to the Grand Jury, committed various overt acts in Los Angeles County and San Bernardino County, within the Central District of California, and elsewhere, including, but not limited to, the following:

**Attempted Distribution of 20 Kilograms of Cocaine in May 2021**

Overt Act No. 1:    On or about May 6, 2021, using coded language via encrypted messages that were set to self-destruct in one day, defendant ZZ9 offered to sell defendants BOUBASH and RAVEN 30 kilograms of cocaine, which was going to be sourced in Central America and sent by plane to Guatemala.

Overt Act No. 2:    On or about May 6, 2021, using coded language via encrypted messages, defendants BOUBASH and RAVEN agreed

7

to invest in 20 kilograms of cocaine and asked defendant ZZ9 to send the information for the money transfer to take place in Mexico City, Mexico.

Overt Act No. 3:   On or about May 6, 2021, defendant ZZ9, using coded language via an encrypted message that was set to self-destruct in one day, sent defendants BOUBASH and RAVEN the name, telephone number, and serial number on a bill of currency of the person who would pick up the money in Mexico City, Mexico.

Overt Act No. 4:   On or about May 20, 2021, using coded language via encrypted messages, defendant ZZ9 told defendants BOUBASH and RAVEN that the cocaine would be loaded onto the plane the following day.

Overt Act No. 5:   On or about May 20, 2021, using coded language via encrypted messages, defendant BOUBASH told defendant ZZ9 that he had cocaine buyers in Europe, Asia, Mexico City, Los Angeles, Canada, and Australia.

Overt Act No. 6:   On or about May 20, 2021, using coded language via encrypted messages, defendant ZZ9 solicited defendants BOUBASH and RAVEN to help in finding planes and explained later in a revised message that they needed a lot of planes because they burned them after landing.

Overt Act No. 7:   On or about May 21, 2021, using coded language via a revised encrypted message, defendant ZZ9 told defendants BOUBASH and RAVEN that the plane was being loaded and thereafter sent them a photograph of the inside of the plane with boxes containing cocaine inside.

Overt Act No. 8:   On or about May 22, 2021, using coded language via encrypted messages, defendant ZZ9 relayed to defendants

BOUBASH and RAVEN that there was an unexpected rainstorm and the plane crashed, causing the plane to explode, and killing the two pilots.

Overt Act No. 9:   On or about May 22, 2021, using coded language via an encrypted message set to self-destruct in three days, defendant BOUBASH asked defendant ZZ9 to send a picture of the crash with the date.

Overt Act No. 10:   On or about May 22, 2021, using coded language via encrypted messages, defendant ZZ9 relayed that they needed to be careful with the report because they needed to pay off the government to not allow the Drug Enforcement Administration in to investigate the crash.

Overt Act No. 11:   On or about May 23, 2021, using coded language via encrypted messages, defendant ZZ9 passed the names of the pilots to defendants BOUBASH and RAVEN and offered to give them 10 kilograms of cocaine from the next shipment, and 10 kilograms of cocaine on the following shipment.

**Distribution of 100 Kilograms of Methamphetamine in June 2021**

Overt Act No. 12:   On or about June 9, 2021, using coded language via encrypted messages, defendant RAVEN told defendant ZZ9 that defendants BOUBASH and RAVEN needed 100 units of methamphetamine and asked if defendant ZZ9 could sell to them.

Overt Act No. 13:   On or about June 9, 2021, using coded language via an encrypted message set to self-destruct in one hour, defendant ZZ9 told defendants BOUBASH and RAVEN that a batch of methamphetamine was scheduled to cross from Mexico into the United States that day.

Overt Act No. 14:   On or about June 10, 2021, using coded language via encrypted messages, defendant RAVEN told defendant ZZ9 and an individual defendant ZZ9 believed to be a drug trafficker, but who was, in fact, a confidential informant ("CI") cooperating with law enforcement to come to Toronto, Ontario, Canada after the shipment of methamphetamine arrived in order to discuss additional shipments of drugs.

Overt Act No. 15:   On or about June 10, 2021, using coded language via encrypted messages, defendant RAVEN told defendant ZZ9 that defendants BOUBASH and RAVEN wanted the shipment of methamphetamine to be picked up in one drop.

Overt Act No. 16:   On or about June 10, 2021, using coded language via an encrypted message, defendant BOUBASH told defendant ZZ9 that he and defendant RAVEN would provide information for a courier who could pick up the shipment of methamphetamine that was scheduled to cross from Mexico into the United States.

Overt Act No. 17:   On or about June 10, 2021, using coded language via encrypted messages set to self-destruct in one day, defendant ZZ9 told defendant BOUBASH that the methamphetamine was packaged in 110 two-pound vacuum sealed bags and totaled 100 kilos.

Overt Act No. 18:   On or about June 11, 2021, using coded language via an encrypted message, defendant RAVEN sent defendant ZZ9 the name and telephone number of a courier who could pick up the 100 kilos of methamphetamine on behalf of defendant BOUBASH and defendant RAVEN.

Overt Act No. 19:   On or about June 12, 2021, using coded language via encrypted messages that were set to self-destruct in one day, defendant ZZ9 told defendants BOUBASH and RAVEN that a courier

would be dropping off the 100 kilos of methamphetamine that day and that defendant ZZ9 would send a picture of the serial number of a confirming bill of currency once the drop was done.

Overt Act No. 20:   On or about June 12, 2021, via encrypted messages set to self-destruct in one day, defendant ZZ9 sent defendants BOUBASH and RAVEN a photo of a bill of currency and indicated the drop was done.

**Distribution of 300 Kilograms of Methamphetamine in October 2021**

Overt Act No. 21:   On or about October 19, 2021, using coded language via encrypted messages that were set to self-destruct in one day, defendant ZZ9 told defendants BOUBASH and RAVEN that 300 kilograms of methamphetamine had arrived in Los Angeles and asked defendant BOUBASH what he could pay for the 50 additional kilograms that defendant BOUBASH had not yet purchased.

Overt Act No. 22:   On or about October 19, 2021, using coded language via encrypted messages, defendant ZZ9 asked defendant BOUBASH to pass along the information on defendant BOUBASH's courier so that the 300 kilograms of methamphetamine would be delivered.

Overt Act No. 23:   On or about October 19, 2021, using coded language via encrypted messages, defendant BOUBASH told defendant ZZ9 he had $4.3 million ready in Mexico that defendant BOUBASH could use to pay for the 300 kilograms of methamphetamine.

Overt Act No. 24:   On or about October 19, 2021, using coded language via encrypted messages, defendant BOUBASH sent defendant ZZ9 the name and telephone number of a courier who could pick up the 300 kilograms of methamphetamine on behalf of defendant BOUBASH.

Overt Act No. 25:   On or about October 21, 2021, via encrypted messages, defendant BOUBASH sent photographs of the methamphetamine

to defendant ZZ9 and the CI and said his associates were working on determining the weight.

**Distribution of 22.19 Kilograms of Methamphetamine in February 2022**

Overt Act No. 26:  On or about February 8, 2022, using coded language via encrypted messages, defendant RAVEN asked the CI to provide information for a courier in Los Angeles who could pick up 50 pounds of methamphetamine the following day.

Overt Act No. 27:  On or about February 8, 2022, using coded language via encrypted messages, defendant BOUBASH told the CI that defendant BOUBASH's drug trafficking organization would deliver the 50 pounds of methamphetamine to the CI.

Overt Act No. 28:  On or about February 8, 2022, using coded language in a telephone call, defendant LOZANO agreed to meet the CI in approximately an hour to drop off approximately 50 pounds of methamphetamine.

Overt Act No. 29:  On or about February 8, 2022, in Ontario, California, defendant LOZANO and another individual delivered approximately 22.19 kilograms of methamphetamine to the CI on behalf of defendant BOUBASH's drug trafficking organization.

Overt Act No. 30:  On or about February 24, 2022, using coded language via encrypted messages, defendant RAVEN asked the CI if the CI had the money to pay for the 22.19 kilograms of methamphetamine that defendant LOZANO delivered to the CI.

Overt Act No. 31:  On or about February 24, 2022, using coded language via encrypted messages, defendant RAVEN instructed a coconspirator ("Coconspirator 1") to pick up the drug payment from the CI.

Overt Act No. 32:   On or about February 25, 2022, in Toronto, Ontario, Canada, Coconspirator 1 picked up from an individual Coconspirator 1 believed was a drug trafficking associate of the CI, but who was, in fact, an undercover law enforcement officer ("UC"), approximately $62,000 in Canadian currency as payment for the approximately 22.19 kilograms of methamphetamine that the CI received from defendant LOZANO.

Overt Act No. 33:   On or about February 25, 2022, using coded language via encrypted messages, defendant RAVEN asked the CI how much money the CI had delivered to Coconspirator 1, to which the CI responded that it was $62,000.

COUNT TWO

[21 U.S.C. §§ 841(a), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS BOUBASH, RAVEN, and LOZANO]

On or about February 8, 2022, in San Bernardino County, within the Central District of California, defendants MOHAMMAD-SAEID BOUBASH, also known as ("aka") "Mamba"; First Name Unknown Last Name Unknown, aka "Raven," aka "Greywind," aka "Neom"; and REYES RAMON LOZANO, each aiding and abetting each other, knowingly and intentionally distributed at least 50 grams, that is, approximately 22.19 kilograms, of methamphetamine, a Schedule II controlled substance.

                              COUNT THREE

                  [21 U.S.C. §§ 841(a), (b)(1)(A)(viii)]

                          [DEFENDANT LOZANO]

        On or about March 23, 2022, in San Bernardino County, within the
Central District of California, defendant REYES RAMON LOZANO
knowingly and intentionally possessed with the intent to distribute
at least 50 grams, that is, approximately 45.3 kilograms, of
methamphetamine, a Schedule II controlled substance.

COUNT FOUR

[21 U.S.C. § 846]

[DEFENDANTS ZZ9 AND GARATE]

1.    The Grand Jury re-alleges and incorporates paragraphs 1 through 7 of the Introductory Allegations of this Indictment.

A.    OBJECTS OF THE CONSPIRACY

2.    Beginning on a date unknown and continuing until on or about May 18, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants First Name Unknown Last Name Unknown, aka "ZZ9," aka "ZNX," aka "TG," aka "Benjamin Kenneth Richardson" ("ZZ9"), and GIL ESTEBAN VALDES GARATE ("GARATE") conspired with others known and unknown to the Grand Jury to knowingly and intentionally distribute and to possess with intent to distribute at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

3.    The objects of the conspiracy were to be accomplished, in substance, as follows:

a.    Defendants ZZ9 and GARATE and other coconspirators would use encrypted devices to communicate regarding methamphetamine trafficking so that their communications could not be intercepted or decrypted by law enforcement.

b.    Defendant ZZ9 would coordinate the distribution of methamphetamine.

c.    Defendant GARATE would store and transport methamphetamine to others.

16

C.   OVERT ACTS

4.   In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, defendants ZZ9 and GARATE and others known and unknown to the Grand Jury committed various overt acts in Los Angeles County, within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On or about April 29, 2021, using coded language via encrypted messages, defendant ZZ9 asked an individual who he believed to be a drug trafficker, but who was, in fact, a confidential informant ("CI") cooperating with law enforcement, if the CI could provide an encrypted phone to defendant ZZ9's associate to use when transporting drugs.

Overt Act No. 2:   On or about April 29, 2021, defendant GARATE accepted an encrypted phone from the CI for use in communicating regarding drug trafficking.

Overt Act No. 3:   On or about April 30, 2021, using coded language via encrypted messages, defendant ZZ9 asked the CI if the CI could provide three burner phones to defendant ZZ9's associate for couriers to use when transporting controlled substances.

Overt Act No. 4:   On or about May 1, 2021, using coded language via encrypted messages, defendant ZZ9 told the CI that the associate was there to pick up the burner phones from the CI.

Overt Act No. 5:   On or about May 1, 2021, defendant GARATE accepted three phones from the CI for use in communicating regarding drug trafficking.

Overt Act No. 6:   On or about May 4, 2021, using coded language via encrypted messages with the CI, defendant ZZ9 agreed to

17

coordinate a drug distribution for an individual who defendant ZZ9 believed was the CI's drug associate, but who was, in fact, an undercover officer ("UC").

Overt Act No. 7:   On or about May 5, 2021, using coded language via encrypted messages that were set to self-destruct in one day, defendant ZZ9 asked in a group chat with the CI and the UC how much of the methamphetamine would be paid for up front, to which the UC responded 50 kilograms.

Overt Act No. 8:   On or about May 16, 2021, using coded language via encrypted messages that were set to self-destruct in seven hours, defendant ZZ9 told the UC and the CI that the methamphetamine would be arriving in the next couple of days.

Overt Act No. 9:   On or about May 17, 2021, using coded language via encrypted messages, defendant ZZ9 instructed the UC that the payment for the methamphetamine was to take place in Mexico City, Mexico.

Overt Act No. 10:   On or about May 17, 2021, using coded language via encrypted messages that were set to self-destruct in eleven hours, defendant ZZ9 sent the UC a code name, a telephone number, and a serial number on a bill of currency for a coconspirator who was going to pick up the money from the UC's courier.

Overt Act No. 11:   On or about May 17, 2021, via encrypted messages, defendant ZZ9 sent the UC the address of the location in Burbank, California, where the methamphetamine pick up was set to occur.

Overt Act No. 12:   On or about May 18, 2021, in the early morning at his residence in Santa Clarita, California, defendant GARATE put three cardboard boxes, containing a total of 108 packages

18

containing 49.41 kilograms of methamphetamine, inside of his vehicle and drove towards the direction of the meeting location in Burbank, California.

Overt Act No. 13:   On or about May 18, 2021, at approximately 5:08 a.m., using coded language via encrypted messages, defendant ZZ9 told the UC that defendant GARATE was on his way to the meeting location.

Overt Act No. 14:   On or about May 18, 2021, at approximately 5:24 a.m., using coded language via encrypted messages, defendant ZZ9 told the UC that defendant GARATE was 30 minutes away.

Overt Act No. 15:   On or about May 18, 2021, around 6:00 a.m., after not receiving a response from defendant GARATE, using coded language via encrypted messages, defendant ZZ9 told the CI that they should tell the UC to leave the meeting location just in case law enforcement was aware of the drug transaction that was scheduled to take place.

Overt Act No. 16:   On or about May 18, 2021, after not hearing from defendant GARATE, defendant ZZ9 caused defendant GARATE's encrypted device to be remotely wiped and thereafter told the CI that the wipe was done.

Overt Act No. 17:   On or about May 18, 2021, using coded language via encrypted messages, defendant ZZ9 asked the CI if he knew of a lawyer who could look into law enforcement's stop of defendant GARATE and thereafter, in an encrypted message set to self-destruct in one day, provided the CI with defendant GARATE's full name.

Overt Act No. 18:   On or about May 18, 2021, at his residence in Santa Clarita, California, defendant GARATE possessed with intent

to distribute approximately 37.97 kilograms of methamphetamine, as well as a firearm, namely, an R.B. Industries LTD Fraser .25 caliber pistol, bearing serial number 008105.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS ZZ9 AND GARATE]

On or about May 18, 2021, in Los Angeles County, within the Central District of California, defendant First Name Unknown Last Name Unknown, aka "ZZ9," aka "ZNX," aka "TG," aka "Benjamin Kenneth Richardson," and defendant GIL ESTEBAN VALDES GARATE, aka "Amigazo," aiding and abetting each other, knowingly and intentionally possessed in defendant GARATE's vehicle with intent to distribute at least 50 grams, that is, approximately 49.41 kilograms, of methamphetamine, a Schedule II controlled substance.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT GARATE]

On or about May 18, 2021, in Los Angeles County, within the Central District of California, defendant GIL ESTEBAN VALDES GARATE, also known as "Amigazo," knowingly and intentionally possessed in his residence with intent to distribute at least 50 grams, that is, approximately 37.97 kilograms, of methamphetamine, a Schedule II controlled substance.

COUNT SEVEN

[18 U.S.C. § 924(c)(1)(A)(i)]

[DEFENDANT GARATE]

On or about May 18, 2021, in Los Angeles County, within the Central District of California, defendant GIL ESTEBAN VALDES GARATE, also known as "Amigazo," possessed a firearm, namely, an R.B. Industries model Fraser .25 caliber pistol, bearing serial number 008105, in furtherance of a drug trafficking crime, namely, possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), as charged in Count Six of this Indictment.

1

FORFEITURE ALLEGATION ONE

2

[21 U.S.C. § 853; 18 U.S.C. § 924; 28 U.S.C. § 2461(c)]

3    1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4    Procedure, notice is hereby given that the United States of America

5    will seek forfeiture as part of any sentence, pursuant to Title 21,

6    United States Code, Section 853, Title 18, United States Code,

7    Section 924, and Title 28, United States Code, Section 2461(c), in

8    the event of any defendant's conviction of the offenses set forth in

9    any of Counts One through Six of this Indictment.

10   2.   Any defendant so convicted shall forfeit to the United

11   States of America the following:

12        (a)   All right, title and interest in any and all property,

13   real or personal, constituting or derived from, any proceeds which

14   defendant obtained, directly or indirectly, from any such offense;

15        (b)   All right, title and interest in any and all property,

16   real or personal, used, or intended to be used, in any manner or

17   part, to commit, or to facilitate the commission of any such offense;

18        (c)   All right, title, and interest in any firearm or

19   ammunition involved in or used in any such offense;

20        (d)   To the extent such property is not available for

21   forfeiture, a sum of money equal to the total value of the property

22   described in subparagraphs (a), (b) and (c).

23   3.   Pursuant to Title 21, United States Code, Section 853(p),

24   and as incorporated by Title 28, United States Code, Section 2461(c),

25   any defendant so convicted shall forfeit substitute property if, by

26   any act or omission of said defendant, the property described in the

27   preceding paragraph, or any portion thereof: (a) cannot be located

28

upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count Seven of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any firearm or ammunition involved in or used in such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the convicted defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

1   substantially diminished in value; or (e) has been commingled with

2   other property that cannot be divided without difficulty.

3

4                                              A TRUE BILL

5

6                                                  /S/

7                                              Foreperson

8   E. MARTIN ESTRADA
    United States Attorney
9

10

11  SCOTT M. GARRINGER
    Assistant United States Attorney
12  Chief, Criminal Division

13  SHAWN J. NELSON
    Assistant United States Attorney
14  Chief, International Narcotics,
     Money Laundering, &
15   Racketeering Section

16  BRITTNEY M. HARRIS
    Assistant United States Attorney
17  Deputy Chief, International
     Narcotics, Money Laundering, &
18   Racketeering Section

19  LAUREN RESTREPO
    Assistant United States Attorney
20  Cyber & Intellectual Property
     Crimes Section

21

22

23

24

25

26

27

28